[Crim. No. 3204. Second Dist., Div. 2.—May 28, 1941.]

THE PEOPLE, Respondent, v. LEWIS BLACK et al., Appellants.

Joseph W. Ryan, J. E. Simpson, Swarts & Tannenbaum and Seymour P. Steinberg for Appellants.

Earl Warren, Attorney-General, Frank Richards, Deputy Attorney-General, Buron Fitts, District Attorney, A. H. Van Cott and Arthur Veitch, Deputies District Attorney, for Respondent.

THE COURT.—By an amended indictment defendants were charged in count I with a conspiracy to violate sections 245, 375, subdivision (4) and 518 of the Penal Code, and in counts VI to X inclusive with five separate violations of section 375, subdivision (4) of the Penal Code. Counts II, III, IV and V, which charged the commission of other offenses, were dismissed. The trial, which lasted more than three months, resulted in verdicts finding all the defendants, other than those against whom the charges had been dismissed, guilty of the offenses alleged in count I and in counts VI to X inclusive, and judgments of conviction were accordingly entered. From such judgments and from the orders denying their motions for a new trial defendants have appealed.

The testimony in the voluminous record (more than 9,400 pages) is conflicting in many respects and much of it is circumstantial. Viewing the evidence most favorably to the prosecution, the facts are as follows: In 1926 a group of persons, including some of the defendants, organized an association of cleaners and dyers the object of which was to control, by means of picketing and sabotage, the prices and practices, of the cleaners and dyers in the city of Los Angeles and vicinity. This association continued in existence from 1926 until 1938, although its name was changed from time to time and different individuals became participants in its activities. There is no occasion for detailing the acts committed by the members of the association or their hirelings at a time more than three years prior to the filing of the indictment herein. For the purpose of showing the continuing character of the conspiracy it is sufficient to observe that during the first nine years of its existence the members of the association were endeavoring by every means possible to "whip outlaw cleaning plants into line". The cleaners and dyers who refused to accede to the demands of the conspirators were subjected to many atrocious acts of violence and sabotage. During this period a representative was sent to Chicago to study the methods used by racketeers in the same industry. He returned with a list of the chemicals and acids which were used in that city and disclosed some of the means of sabotage which were there employed. Defendants were informed by the representative that if metallic potassium be concealed in garments sent to be cleaned it would cause fires during the cleaning process; that acid could be sprayed on clothing from fire extinguishers or other instruments, and that indelible dye could be hidden in clothing which, when placed in cleaning solvent in the cleaning drum, would damage all other clothing in the drum. Defendants procured chemicals, acids and equipment and proceeded to apply these methods in Los Angeles.

During the period within three years prior to the filing of the indictment defendants were shown to have been actively connected with the association and were conspirators in furtherance of its objects. Defendants Cowan, Keller and Meyers were owners and operators of both wholesale and retail cleaning establishments and were the moving force in the conspiracy. Defendants Black, Blumenberg, Dansky and

Porter were representatives of various labor unions. The association sought to compel the many cleaners and dyers in the Los Angeles area to enter into agreements with labor unions, to fix the price to be charged for cleaning garments and to prevent anyone not a member of the association from encroaching upon the territory of any member. To enforce their demands defendants and various employees of the association contacted many cleaners and dyers and threatened to cause strikes, to picket the places of business, to assault the owners or operators, to damage property and even to kidnap a child. Many of the cleaners and dyers who refused to comply with these demands discovered to their sorrow that the association was making no idle threats. Non-complying cleaners suddenly found themselves victims of a series of atrocious acts. Windows were broken, indelible dye placed in cleaning drums and powdered dye scattered over clothing in their establishments; "stink bombs" were thrown into their places of business, an obnoxious smelling "perfume" sprayed over garments, acid thrown into the establishments and over garments, a truck filled with clothing was stolen and the garments destroyed by acid, assaults were committed upon cleaners and their employees and pickets were placed in front of the places of business. As a result of such acts much property was damaged, several cleaners were forced to quit business and their establishments were acquired by one or more of the defendants.

In the briefs filed by defendants, which consist of nearly 1500 pages, a multitude of errors are urged. Many of them concern inconsequential matters, and as to others defendants have seen fit to advance no argument whatever. This opinion will be confined to those rulings which if erroneous might have resulted in prejudice to defendants.

Particular stress is laid on defendants' contention that section 375 of the Penal Code is unconstitutional and therefore void. The title and material portions of that section are as follows:

"Putting offensive substance in theater or other place of public assemblage; Making or possessing such substance with unlawful intent; Punishment. Use of substance likely to produce serious illness or permanent injury; Use of tear or mustard gas, acid or explosives; Punishment.

"(1) It shall be unlawful to throw, drop, pour, deposit, release, discharge or expose, or to attempt to throw, drop, pour, deposit, release, discharge or expose in, upon or about any theater, restaurant, place of business, place of amusement or any place of public assemblage, any liquid, gaseous or solid substance or matter of any kind which is injurious to person or property, or is nauseous, sickening, irritating or offensive to any of the senses . . .

"(4) Any person who, in violating any of the provisions of subdivision (1) of this section, willfully employs or uses any liquid, gaseous or solid substance which may produce serious illness or permanent injury through being vaporized or otherwise disbursed in the air, or who, in violating any of the provisions of subdivision (1) of this section, willfully employs or uses tear gas, mustard gas or any of the combinations or compounds thereof, or willfully employs or uses acid or explosives, shall be guilty of a felony and shall be punished by imprisonment in the state prison for not less than one year and not more than five years."

It is asserted that section 375 is so indefinite, uncertain and broad in its terms that it prohibits the legitimate use of acid in industry or in any place of business, and that the crime is not made dependent upon the malicious use of acid with a criminal or wrongful intent. Accordingly defendants contend that the statute violates sections 1 and 13 of article I of the Constitution of the State of California and the Fourteenth Amendment of the Constitution of the United States. The statute must be construed in the light of certain well settled principles. We are enjoined by section 4 of the Penal Code to construe the provisions of the code "according to the fair import of their terms, with a view to effect its objects and to promote justice". Once the intention of the legislature is ascertained it will be given effect even though it may not be consistent with the strict letter of the statute. (*In re Sekuguchi,* 123 Cal. App. 537 [11 Pac. (2d) 655]; *Crawford* v. *Payne,* 12 Cal. App. (2d) 485 [55 Pac. (2d) 1240].) In construing a statute it must be remembered that no law is to be construed in such a manner as to result in a palpable absurdity. (*People* v. *Craycroft,* 111 Cal. 544 [44 Pac. 463].)

Defendants were charged with a conspiracy to violate, and with several violations of, subdivision (4) of section

375. That subdivision, it will be recalled, denounces as a felony the *willful* use of acid in violating subsection (1) of the same section. Construing subsection (4) in the light of the foregoing rules of statutory construction, the legislative intent is clear. The crime denounced is the *willful* throwing, dropping, etc., in, upon or about any of the enumerated places of public assemblage, of an acid which is injurious to person or property, or is nauseous, sickening, irritating or offensive to any of the senses. The element of willfulness set forth in subdivision (4) is expressly made applicable to subdivision (1) by the use of the words, "Any person who, in violating any of the provisions of subdivision (1) of this section . . . willfully employs or uses acid . . . " Such a construction, which is consonant with reason and common understanding, renders the statute definite and certain and does not violate any of the constitutional guarantees. The objection that the word "acid" is too indefinite since in its ordinary meaning it includes many non-harmful liquids and substances is fully met by the construction which we have placed upon such section. The acid must be such as is injurious to person or property, or is nauseous, sickening, irritating or offensive to any of the senses, and the use of such non-harmful acids as vinegar and the like is not prohibited. If, as contended by defendants, the terms of the statute are to be applied literally, then it might be so construed as to prohibit the possession or use of acid in hospitals, laboratories, drugstores, acid manufacturing plants and similar businesses. By employing the term "willfully", however, the legislature has expressly manifested an intent to exclude from the operation of the statute the innocent use of acid in the normal course of business. Such literal construction as defendants urge would result in an absurdity, for, as stated in *People* v. *Craycroft, supra,* at page 547: " . . . a statute will not always be held to include every case which falls within its literal terms; the penalty of death denounced against any person who draws blood in the street is not incurred by a surgeon who bleeds one who has fallen in a fit, and so, generally, no law will be so applied as to work a palpable absurdity." Our conclusion is further strengthened by the fact that in subdivision (2) of section 375 the legislature has dealt with the subject of the manufacture, making or possessing of such substances and has declared such acts

to be criminal only when done *with intent* to throw, drop, etc., such substance in any of the enumerated places of public assemblage.

■ Moreover, it should be observed that defendants are not in a position to attack the validity of the statute. The principal ground urged against the constitutionality of the statute is that subdivision (1) is so broad in its scope that it would permit prosecution of an individual for the innocent possession or use of acid in his business. Defendants were not charged with a violation of subdivision (1) but only with a violation of subdivision (4), consisting of the wilful placing of acid in a place of business. The record fails to disclose any evidence whatever that any of the acts committed by defendants consisted of the innocent use of acid in their places of business. The argument advanced in support of the claim that the statute is void is based entirely upon a hypothetical situation not involved in this case. Under such circumstances defendants' claim that the statute is invalid need not be considered. (*People* v. *Busick*, 32 Cal. App. (2d) 315 [89 Pac. (2d) 657] ; *People* v. *Rogers*, 112 Cal. App. 615 [297 Pac. 924].) One who seeks to raise a constitutional question must show that his rights are affected injuriously by the law which he attacks and that he is actually aggrieved by its operation. (*In re Durand*, 6 Cal. App. (2d) 69 [44 Pac. (2d) 367] ; *People* v. *Perry*, 212 Cal. 186 [298 Pac. 19, 76 A. L. R. 1331].)

■ The assertion that count I of the amended indictment does not state a public offense because it cannot be determined therefrom wherein, how or why defendants have violated a statute of this state cannot be sustained. The material portion of count I is as follows: ''The Grand Jury . . . hereby accuses (defendants) of a felony, towit, the crime of conspiracy to violate section 245, Penal Code of California, section 518, Penal Code of California, and section 375, subdivision 4, Penal Code of California . . . '' The following portions of the count consist of allegations charging defendants generally with a conspiracy to commit assaults, to extort money and to throw acid in places of business. Nineteen separate overt acts are alleged to have been committed in furtherance of the conspiracy. The attack upon the sufficiency of this count is apparently based upon the claim that the crimes, the commission of which was the

alleged object of the conspiracy, are not alleged with sufficient particularity as to times, places and persons. Defendants were not charged in count I with the actual commission of the specific crimes but were charged merely with a conspiracy to commit such crimes. It must be borne in mind that the gist of the crime of conspiracy is the unlawful agreement to commit any crime accompanied by an overt act in furtherance of such agreement. (*People* v. *Cory*, 26 Cal. App. 735 [148 Pac. 532]; Pen. Code, secs. 182 and 184.) The fact that the conspirators may succeed in perpetrating the acts which they conspired to commit, and that such acts constitute separate crimes, cannot operate to relieve them from liability for the conspiracy. (*People* v. *Martin*, 114 Cal. App. 337 [300 Pac. 108].) In the light of such principles count I is sufficiently definite and certain to charge defendants with the crime of conspiracy.

It is next contended that counts VI to X inclusive are fatally defective in that each count charges the commission of more than one offense and therefore does not comply with the requirements of sections 950, 951, 952 and 954 of the Penal Code. The argument is directed against that portion of section 375, subdivision (1) of the Penal Code which reads: "It shall be unlawful to throw, drop, pour, deposit, release, discharge or expose . . . any liquid . . . " Defendants contend that this section makes it unlawful to commit seven different crimes, namely: (1) to throw; (2) drop; (3) pour; (4) deposit; (5) release; (6) discharge; and (7) expose, any liquid substance, etc., in the places prohibited by the statute. Since in each of the counts in question defendants are charged with a violation of section 375 of the Penal Code in substantially the same language which is employed in the statute, it is asserted that each count charges defendants with the commission of seven different crimes. In *People* v. *Pierce*, 14 Cal. (2d) 639 [96 Pac. (2d) 784], a similar contention was made with respect to an information which charged defendants in the language of the statute with a violation of section 337a, subdivision (2) of the Penal Code. That section provides essentially that it shall be unlawful for anyone to keep or occupy a "room, shed, tenement, tent, booth, building, float, vessel, place, stand and enclosure" for the purpose of recording bets. Defendants argued that a single count of the information charged them with the commission of eleven different of-

fenses. The court held, however, that but one offense was charged, namely, the keeping and occupying of any place for the purpose of illegal wagering, and that the type of place was wholly immaterial. We therefore hold that each of the counts in question sets forth but a single offense, that of putting a substance which is injurious to person or property or is offensive to the senses in any of the designated places. The means employed to put or place the substance is wholly immaterial, for the gravamen of the offense is the putting of the substance in a place of public assemblage. Contrary to the contention of defendants, it was entirely proper to charge the commission of the offense in the language of the statute. (*People* v. *Pierce, supra.*)

A large portion of defendants' briefs is devoted to numerous assignments of alleged misconduct on the part of the deputy district attorney and the court. Although the various statements, questions, objections and rulings of the court are set forth in the briefs, in only one or two instances has an attempt been made to point out wherein such conduct was prejudicial to the rights of defendants. Furthermore, the only authorities cited are general ones which sustain the proposition that if there is misconduct which is prejudicial to the substantial rights of the defendants the judgment of conviction should be reversed. Where the several claims of error are accompanied neither by argument nor by citation of appropriate authority, we are not called upon to consider the points so presented. (*People* v. *Koenig,* 133 Cal. App. 701 [24 Pac. (2d) 852]; *People* v. *Hollowwa,* 138 Cal. App. 174 [31 Pac. (2d) 821].) In those few instances where some impropriety appears in the questions asked or statements made by the prosecutor, no prejudice resulted therefrom.

Moreover, since the trial court repeatedly admonished the jury to disregard the questions and statements of the district attorney and to draw no inferences therefrom, it must be presumed that the jury heeded the admonition and that no harm resulted from such conduct. (*People* v. *Bosse,* 21 Cal. App. (2d) 276 [68 Pac. (2d) 990].) The claim of misconduct on the part of the court is without merit, for the statements complained of were of a trivial nature and in most instances were accompanied by an admonition to the jury to disregard them. With respect to the alleged misconduct of the district attorney in his argu-

ment to the jury, it appears that many of the matters now assigned as error were not objected to at the time the statements were made and accordingly will not be considered by this court. (*People* v. *Kennedy*, 21 Cal. App. (2d) 185 [69 Pac. (2d) 224]. It must be conceded that in a few instances during the argument the prosecutor did depart from the record and in so doing exceeded the bounds of propriety. However, on numerous occasions during the course of the argument the jurors were admonished to disregard objectionable statements of the prosecutor and were instructed that their verdict should be based upon the evidence as they heard it in the courtroom and upon nothing else. We must assume that these admonitions were followed.

It must be remembered that the present trial was hotly contested and that it lasted several months. It would be very unusual for such a lengthy trial to be entirely free of improper conduct on the part of the prosecutor, defense counsel or even the court. After a careful consideration of the entire record, including the evidence, we are satisfied of the guilt of defendants and are convinced that such improprieties as may have existed did not result in a miscarriage of justice. (Art. VI, sec. $4\frac{1}{2}$, Const. of California.)

 It is argued that the evidence is insufficient to sustain convictions under counts VI, VII, VIII, IX and X of the amended indictment. Each of these counts charged defendants with a violation of section 375, subdivision (4) of the Penal Code, differing only as to the places where the offenses were alleged to have been committed. It would unduly prolong this opinion to discuss in detail the sufficiency of the evidence as to each count, and since in general the evidence as to each count is similar to the evidence in the others we will confine our discussion to count VI.

Defendants take the position that there is no evidence tending to connect any of them with the commission of the offense charged in count VI or to show that the acid used was irritating or offensive to the senses. By count VI defendants were charged with wilfully placing acid which was injurious to person and property and offensive to the senses in a place of business located at 827 South Vermont Avenue, Los Angeles. The evidence shows that this cleaning establishment was owned by one Pogrell. On numerous occasions Pogrell had been approached by one or more of the defendants, who

requested that he raise his prices. Upon his refusal to meet the demands of the association threats were made, particularly by defendants Keller, Lushing and Cowan, who threatened to put him out of business. Several of the defendants told Pogrell that they had dealt with many recalcitrant cleaners and if he failed to comply with their demands they "had a lot of different ways and means to whip him in line", and boasted of having sprayed acid over garments in other shops. Following the threats various acts of sabotage were committed against Pogrell. The windows of his store were broken on three separate occasions, clothing was stolen, stench bombs and dye which caused damage to garments were placed in his shop, pickets were stationed in front of his store and attempt was made to assassinate him. When the windows were broken for the third time acid which destroyed or damaged many garments was thrown into the store. Pogrell's fingers were burned by the acid when he attempted to clean it up. Because of the losses which he sustained Pogrell was forced into bankruptcy. That the acid was injurious to person and property and offensive to the senses is evident. When this evidence is considered together with the evidence relating to the conspiracy and the fact that the conspirators had procured acid for such uses, it is sufficient to connect defendants with the commission of the offense charged. All conspirators are liable for the acts of their co-conspirators committed in furtherance of the proven purpose of the conspiracy. (*People* v. *Cowan*, 38 Cal. App. (2d) 231 [101 Pac. (2d) 125].) While the evidence connecting defendants with the commission of the crime charged in count VI was circumstantial, such circumstances reasonably justify the verdict and we therefore are not warranted in interfering with the determination of the jury. (*People* v. *Newland*, 15 Cal. (2d) 678 [104 Pac. (2d) 778].) The evidence is likewise sufficient as to counts VII, VIII, IX and X.

After deliberating for three days the jury returned into court and requested additional instructions. Defendants contend that the statements or instructions which the court gave in answer to the questions of the jury were erroneous. Defendants have singled out for criticism isolated words or phrases used by the court on this occasion. Instructions are to be considered as a whole. (*People* v. *Countryman*, 115 Cal. App. 36 [300 Pac. 871]; *People* v.

*White,* 35 Cal. App. (2d) 61 [94 Pac. (2d) 617].) We are satisfied that those instructions concerning which only a portion is subjected to criticism are, when considered in their entirety, correct statements of the law. ■■■ The court was also asked "if the acts charged in counts six, seven, eight, nine and ten are found to be acts committed in furtherance of the conspiracy, does it then follow that any person found guilty under count one of the indictment would then be guilty under counts six, seven, eight, nine and ten of the indictment?" In reply the court stated: "The answer is that if a conspiracy is established and that the jury also finds that in pursuance of that conspiracy and the object of that conspiracy the acts set forth in counts six, seven, eight, nine and ten were committed, that all . . . members of that conspiracy are equally guilty of the offenses charged in counts six, seven, eight, nine and ten, if you find that those offenses were, however, committed." Defendants assert that not only is this instruction an incorrect statement of the law, but also that it amounts to a directed verdict. On the contrary, the instruction correctly states the law (*People* v. *Cowan, supra*), and obviously does not amount to a directed verdict, for it is clearly left to the jury to decide whether a conspiracy actually existed and whether any of the offenses charged in counts VI to X were committed.

■■■ Much of the testimony relating to the conspiracy came from the witnesses Fred Chesney, Morris Malter and Paul Mitchell, who were accomplices. Defendants contend that the testimony of these witnesses was not corroborated and is therefore insufficient to sustain the verdict under count I. The rule in this respect is that evidence corroborative of an accomplice's testimony need not of itself establish guilt or encompass every detail of such testimony, it being deemed sufficient "if standing alone, it tends to connect defendant with the commission of the offense charged". (*People* v. *Martinez,* 19 Cal. App. (2d) 599, 603 [66 Pac. (2d) 161].) In our statement of facts we have set forth some of the circumstances, such as the purchase of acid and equipment and the making of threats, which tend to corroborate the testimony of the accomplices. Many other corroborative circumstances appear in the record but it would be superfluous to set them forth herein. We are satisfied after reading the entire record that, measured by the rule above stated,

there is ample evidence to corroborate the testimony of the accomplices.

■ Complaint is made of the action of the court in permitting the prosecution to introduce evidence concerning asserted isolated, independent and unconnected crimes and acts of sabotage. The evidence in question is that which shows a series of overt acts committed in furtherance of the continuing conspiracy to organize the cleaning industry which began in 1926 and continued until 1938. In relying upon the familiar rule that evidence of independent crimes is not competent if it has no tendency to prove some material fact in connection with the crime charged, defendants have completely ignored the fact that they were charged with a conspiracy to commit numerous unlawful acts. While it is true that some of the evidence relating to acts of sabotage and violence committed against various cleaners and dyers was not directly attributed to any of the defendants, it was not necessary that defendants be directly connected with all of the acts of violence. From the very secretive nature of a conspiracy it would not ordinarily be possible to prove such a crime by direct evidence. Accordingly it is settled that a conspiracy may be proved by circumstantial evidence. (*People* v. *Yant,* 26 Cal. App. (2d) 725 [80 Pac. (2d) 506]; *People* v. *King,* 30 Cal. App. (2d) 185 [85 Pac. (2d) 928]; *People* v. *Schmidt,* 33 Cal. App. 426 [165 Pac. 555].) Many of the acts in question were shown to have been committed shortly after the making of threats by defendants or at a time when one of the defendants or an employee of the association was on the premises. It was for the jury to determine from all of the circumstances whether the various acts of sabotage and violence were committed by one or more of the defendants in furtherance of the general design or objects of the conspiracy. This they did under appropriate instructions on the subject from the court.

■ Defendants contend that the court erred in admitting testimony of the conversations and acts of the conspirators which occurred at a time more than three years prior to the date of the indictment. A similar contention is disposed of in *People* v. *Stevens,* 78 Cal. App. 395 [248 Pac. 696], wherein the court likens a conspiracy to a large tree, which originates in a tiny tendril and requires a long time and persistent nurture to develop into a matured tree, and

at page 407 states: "In our opinion there is no valid objection to evidence in conspiracy cases which tends to show, step by step, the gradual formation of a criminal concord in the minds of those charged with the illicit combination, merely because the evidence begins at a time long anterior to the wrongful meeting of minds. It is necessary only that the evidence, in all its parts, tends to prove the formation of the conspiracy." The evidence was properly admitted because it tended to show the formation and continuation of the conspiracy from the time of its inception until 1938. (*People* v. *Cowan, supra.*)

The action of the court in permitting an expert witness for the prosecution to conduct an experiment before the jury for the purpose of demonstrating the flame reaction and other dangerous qualities of metallic potassium is assigned as prejudicial error. It is contended that no foundation was laid for the admission of such evidence, and further that there is no evidence that such substance was ever used by the conspirators. The metallic potassium was admissible in evidence since it had been identified as the actual substance which the conspirators had acquired for use in furtherance of the objects of the conspiracy. (*People* v. *Ferdinand*, 194 Cal. 555 [229 Pac. 341]; *People* v. *Wilkins*, 158 Cal. 530 [111 Pac. 612].) It was entirely within the discretion of the trial court to permit the evidence of the experiment, for it was conducted under substantially similar conditions to those which were shown in evidence and the result of the experiment was clearly material. (*People* v. *Ferdinand, supra; People* v. *Ely*, 203 Cal. 628 [265 Pac. 818].) Upon his return from Chicago where he had been sent by defendants to study methods of sabotage used in that city, Paul Mitchell informed defendant Keller what chemicals he would have to procure, naming metallic potassium as one. After the chemicals were procured Mitchell told Keller that the metallic potassium should be sliced and sewed in the seams of garments and that it would catch fire if it came in contact with any moisture. There is evidence from which the jury might have inferred that such substance was used by defendants in committing acts of sabotage. However, the mere fact that metallic potassium was obtained by defendants for use in furtherance of the objects of the conspiracy con-

stituted an overt act, evidence of which was properly admitted. The experiment which demonstrated the destructive qualities of metallic potassium was therefore corroborative of the prosecution's theory that possession of the substance amounted to an overt act and tended to aid rather than confuse the jury.

The remaining contentions are concerned with the giving or refusal to give certain instructions. The court did not err in instructing the jury that as a matter of law the prosecution witnesses Malter, Mitchell and Chesney were accomplices. Each of these witnesses testified to acts done by him which were clearly performed in furtherance of the purposes of the conspiracy. Their own and other testimony is sufficient to show that they were members of the conspiracy. They were therefore liable to prosecution for the identical offense charged against the defendants on trial, and accordingly were accomplices. (Pen. Code, sec. 1111.) Since each witness freely testified to his part in the conspiracy and there is no conflicting evidence on the point, the court properly gave the instruction complained of. (*People* v. *Bailey*, 82 Cal. App. 700 [256 Pac. 281].) It was proper to instruct the jury that it was immaterial upon what particular day any offense charged in the indictment was committed, provided the jury believed that such offense was committed within three years prior to the filing of the indictment. Under the conspiracy count it was only necessary for the jury to find that any *one* of the overt acts charged in count I had been committed within three years prior to the filing of the indictment. Each of counts VI to X inclusive charged but a single crime and alleged that it had been committed on or about a specified date. The only evidence relating to each of such counts shows that but one offense was committed, as charged, and that it was within three years prior to the filing of the indictment.

It was not error for the court to refuse to give defendants' requested instruction to the effect that they were not charged with a conspiracy to establish uniform prices in the cleaning industry or to control the taking of "stops" from one cleaner by another. The jury was elsewhere fully instructed to the effect that defendants were not on trial for any offense not charged in the indictment. The requested instruction concerning the right of labor to strike was

properly refused, for it was not pertinent to any issue in the case. Defendants were not charged with unlawfully striking nor with a conspiracy to do so.

The judgments and orders denying the motions for new trials are affirmed.

McCOMB, J., Dissenting.—I dissent. These are appeals by defendants from (1) a judgment of guilty of conspiracy to violate sections 245, 375, subdivision 4, and 518 of the Penal Code, and (2) five judgments of guilty of violating section 375, subdivision 4, of the Penal Code, after trial before a jury. There are also appeals from the orders denying the motions of defendants for a new trial.

Viewing the evidence most favorably to the People (respondent), it appears that during the last half of 1937 and the year 1938 defendants entered into a conspiracy to force the various cleaning and dyeing establishments in the Los Angeles area to enter into agreements with the labor union known as the International Association of Cleaning and Dye House, Local No. 5, and that pursuant to this conspiracy numerous heinous, barbaric and atrocious acts were perpetrated in order to force the owners of cleaning and dyeing plants to enter into contracts with the association. For example, rocks were thrown through the windows of establishments that did not accede to the demands of the conspirators, stink bombs were thrown into the places of business of non-cooperating cleaners, shots were fired into establishments of non-cooperating cleaning and dyeing operators and numerous other acts of a criminal nature were committed which would have dimmed the fame of the wicked and villainous vandals of the dark ages. It would serve no useful purpose to enumerate them in this opinion. The testimony upon which the foregoing facts are predicated was principally based on circumstantial evidence or came from the mouths of admitted co-conspirators. As is usually the case in such a trial, there was a sharp conflict in the evidence, the defendants denying any participation in the crimes charged.

Numerous errors are urged by defendants for reversal of the judgments against them. However, it is only necessary to decide the following questions:

*First: Is section 375, subdivision 4, of the Penal Code constitutional?*

*Second: Assuming that section 375, subdivision 4, of the Penal Code is unconstitutional, can the conviction of defendants upon count I of the indictment as amended be sustained, in view of the fact that it charged a conspiracy upon the part of defendants to violate not only section 375, subdivision 4, of the Penal Code, but also sections 245 and 518 of the same code, and considering also that there was substantial evidence (which, however, was contradicted) received during the trial to support a finding by the jury that defendants violated each or all of the Penal Code sections just mentioned?*

The first question should in my opinion be answered in the negative and is governed by this principle of law: That a citizen pursuant to section 1 of the Fourteenth Amendment of the Constitution of the United States and section 1, article I of the Constitution of the State of California, may not be deprived of the right to the enjoyment and use of his property by a statute which is unreasonable and oppressive, and a statute depriving a citizen of his property is unreasonable and oppressive when it has no reasonable relation to the police power. (*In re McCapes,* 157 Cal. 26, 27 [106 Pac. 229].)

Section 375, subdivision 4, of the Penal Code reads thus:

*"Use of substance likely to produce serious illness or permanent injury: Use of tear or mustard gas, acid or explosives: Punishment.* Any person who, in violating any of the provisions of subdivision (1) of this section, willfully employs or uses any liquid, gaseous or solid substance which may produce serious illness or permanent injury through being vaporized or otherwise disbursed in the air or who, in violating any of the provisions of subdivision (1) of this section, willfully employs or uses any tear gas, mustard gas or any of the combinations or compounds thereof, or willfully employs or uses acid or explosives, shall be guilty of a felony and shall be punished by imprisonment in the State prison for not less than one year and not more than five years."

Subdivision (1) of section 375 of the Penal Code, referred to in subdivision (4) of the same section, reads thus:

"It shall be unlawful to throw, drop, pour, deposit, release, discharge or expose, or to attempt to throw, drop, pour, deposit, release, discharge or expose in, upon or about any theater, restaurant, place of business, place of amusement or

any place of public assemblage, any liquid, gaseous or solid substance or matter of any kind which is injurious to person or property, or is nauseous, sickening, irritating or offensive to any of the senses.''

From a reading of subdivisions (1) and (4) of section 375 of the Penal Code it appears that the legislature has attempted to make it unlawful for a citizen to drop, pour, deposit or expose in any place of business any liquid, gaseous or solid substance or matter which is injurious to person or property or is nauseous, sickening, irritating or offensive to any of the senses.

It is evident that if the wording of this statute is constitutional it would be unlawful for a druggist to expose in his apothecary shop asafetida, carbolic acid, bichloride of mercury, nitric acid or numerous other acids and substances which are daily employed for the protection of the life and health of mankind. Therefore, the statute is unreasonable and oppressive and falls within the purview of the rule of law above stated as being violative of section 1 of the Fourteenth Amendment of the Constitution of the United States and of section 1, article I of the Constitution of this state, and it is therefore unconstitutional. (*In re McCapes, supra.*)

In the McCapes case our Supreme Court had before it the question of the constitutionality of subdivision 3 of section 384 of the Penal Code, which made it a misdemeanor for any person willfully or negligently to build ''a fire on his own land for the purpose of burning brush, stumps, logs, rubbish, fallen timber, fallows, grass or any other thing whatsoever, . . . provided, that any state or district fire warden may in his reasonable discretion give a written permit to any person desiring to build fires''. Mr. Justice Henshaw, speaking for the court, said at page 27:

''It is to be noted that the act is designed to prevent the destruction of property, and particularly of forests, by the careless setting of fires. In its purview and purpose, therefore, the act is within the police power of the state. No one at this day can be unaware of the great havoc wrought by forest fires, and indeed, in states such as this, which undergo long periods of drouth, of the loss which results from fires sweeping over the farming lands and destroying the crops. The purpose of the law being for the general good of the

state, to prevent the destruction of property by fires carelessly set and allowed to escape control, not only brings the act strictly within the police power, but the purpose must commend the act to every court. Nevertheless, in the accomplishment of that purpose, it is quite plain that the legislature has transgressed all reasonable bounds. It is an exemplification of what this court said in *Ex parte Jentzsch,* 112 Cal. 468 [44 Pac. 803, 32 L. R. A. 664] : 'So, while the police power is one whose proper use makes most potently for good, in its undefined scope and inordinate exercise lurks no small danger to the republic. For the difficulty which is experienced in defining its just limits and bounds affords a temptation to the legislature to encroach upon the rights of citizens with experimental laws, none the less dangerous because well meant.'

" . . . Such a law upon the face of it is an unreasonable interference with the rights of property. But if it be said that notwithstanding the language, the law will be given a construction which will avoid hardship, it must be answered that by its terms it makes it a crime for any man to light a fire on his land for the purpose of burning 'anything whatsoever,' and declares the person who does so a criminal, regardless of the fact that the fire was carefully set and guarded and regardless of the fact that no injury to anybody resulted from the setting. In other words, every person so setting a fire would be guilty of a crime, and the question whether he should be punished or not would rest largely in the friendship or hostility of his neighbors, or of the informer who by this law receives one-half of the fines upon conviction. The facts in the case at bar may be referred to in illustration of the working of such a law. The petitioner was digging a well upon his own land. It became necessary for him to blast rock. Fearful lest a burning fuse hurled by the exploding blast might set fire to the grass in the vicinage he prudently and carefully burned off this dry grass without causing the slightest damage to any property. He built this fire, however, without obtaining permission from a district fire-warden. Indeed, at the time that he set it there was no district fire warden. Subsequently the county of Madera caused the appointment of a fire warden, and this fire warden procured the arrest of the defendant for a violation of the law. This brief

statement will better serve to illustrate the unreasonableness of the law than would many pages of exposition.''

To the same effect see *San Diego T. Assn.* v. *East San Diego,* 186 Cal. 252, 253 [200 Pac. 393, 17 A. L. R. 513]; *In re Farb,* 178 Cal. 592, 593 [174 Pac. 320, 3 A. L. R. 301]; *In re Kelso,* 147 Cal. 609, 610 [82 Pac. 241, 109 Am. St. Rep. 178, 2 L. R. A. (N. S.) 796]; *In re Hall,* 50 Cal. App. 786, 787 [195 Pac. 975].

It is therefore evident that the conviction of defendants on counts VI to X of the indictment charging violations of section 375, subdivision (4) of the Penal Code should be reversed.

The second question should also be answered in the negative. Count I of the amended indictment read in part as follows:

''The Grand Jury of the County of Los Angeles, State of California, hereby accuses LEWIS BLACK, SAMUEL BLUMENBERG, ROBERT COWAN, HARRY DANSKY, JOSEPH M. INGLER, CAL T. FISH, BEN KELLER, ALFRED LUSHING, JAMES MEYERS, FRED MOODY, THOMAS PORTER, GEORGE RUBEN, FRANK D. SCOVEL and BEN TORICI alias BEN TORTORICI, of a felony, to-wit, the crime of CONSPIRACY TO VIOLATE SECTION 245, Penal Code of CALIFORNIA, SECTION 518, PENAL CODE OF CALIFORNIA, and SECTION 375, SUBDIVISION 4, PENAL CODE OF CALIFORNIA, in that, within three years prior to the finding of this amended indictment and continuously thereafter, in the County of Los Angeles, State of California, the above named defendants did willfully, unlawfully and feloniously conspire, combine, confederate and agree together, and with divers other persons whose true names are to the Grand Jury unknown, to commit assaults upon the person of other persons by means of force likely to produce great bodily injury, and further to obtain property of other persons not these conspirators, with the consent of said other persons, which was induced by the wrongful use of force and fear.

''And further to willfully throw, drop, pour, deposit, release, discharge, and expose in, upon and about, places of business, said places of business not being the places of business of these conspirators, a liquid substance and matter containing acid, which said substance and matter is and was

injurious to person and property and which was and is irritating and offensive to the senses, and which substance containing acid, as aforesaid, was willfully and knowingly employed and used by the aforesaid defendants.''

In the balance of the count nineteen specific overt acts were alleged.

As stated above, the evidence in support of the conviction under count I of the indictment was highly conflicting, circumstantial, and came principally from the mouths of admitted accomplices. The jury might have believed the evidence tending to find defendants guilty of violating section, 375, subdivision 4 of the Penal Code and disbelieved the evidence tending to show defendants guilty of violating sections 245 and 518 of the Penal Code. If this were true, defendants would not be guilty of any offense under count I of the indictment, and, since I am unable to determine which evidence the jury believed (since count I of the indictment charged a violation of all three of the sections of the Penal Code, including the unconstitutional section), the judgments of guilty on count I should in my opinion be reversed. Whether guilty or innocent, the defendants were entitled to have their case tried according to the established rules of law; and though the trial in the instant case may have resulted in justice to the particular defendants, yet such justice is unjust and dangerous to the community. In a recent case Mr. Justice White has pungently stated the principle thus: ''The doctrine that respect for the law cannot be inspired by withholding the protection of the law is one which recognizes no exceptions'' (*People* v. *Braun,* 31 Cal. App. (2d) 593, 603 [88 Pac. (2d) 728]).

For the foregoing reasons the judgments in my opinion should be reversed and new trials ordered.

A petition for a rehearing was denied June 12, 1941. McComb, J., voted for a rehearing.

Appellants' petition for a hearing by the Supreme Court was denied June 26, 1941.